**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **LAYLA MOORE** | § | |
| | § | |
| **VS.** | § | **A-18-CV-363 LY** |
| | § | |
| **BAYLOR SCOTT & WHITE HEALTH** | § | |

**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

TO:    THE HONORABLE LEE YEAKEL
       UNITED STATES DISTRICT JUDGE

Before the Court are Defendant's Motion for Summary Judgment (Dkt. No. 17); Plaintiff's

Response (Dkt. No. 22); Defendant's Reply (Dkt. No. 23); and Plaintiff's Sur-Reply (Clerk's Dkt.

No. 27). The undersigned submits this Report and Recommendation to the United States District

Court pursuant to 28 U.S.C. § 636(b) and Rule 1(h) of Appendix C of the Local Court Rules.

**I.  GENERAL BACKGROUND**

In this lawsuit, Layla Moore alleges that Baylor Scott & White Health ("BS&W") terminated

her employment because of her race and disability in violation of Title VII of the Civil Rights Act

of 1964, the Americans with Disabilities Act, 42 U.S.C. § 1981, and the Texas Commission on

Human Rights Act ("TCHRA"). Moore also alleges that she was retaliated against after she made

complaints of race discrimination in violation of Title VII, the TCHRA and § 1981. BS&W asks

that the Court enter summary judgment in its favor on all of Moore's claims.[1]

---

[1]BS&W's motion was filed after the March 25, 2019, dispositive motion deadline contained
in the Scheduling Order, Dkt. No. 10, and the district judge specifically denied BS&W's request for
leave to file the motion late. In doing so he warned BS&W that if it did file the motion late, that
"may result in the court's carrying any such motions to trial." Dkt No. 18 at 2. Because the district
court nevertheless referred the motion to the undersigned, the undersigned addresses the merits of
the motion.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). If the nonmoving party fails to make a showing sufficient to establish the existence of an

element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

### III.  SUMMARY JUDGMENT EVIDENCE

The following facts are based on the summary judgment evidence, viewed in the light most favorable to Moore.  Moore began her employment with BS&W on April 4, 2016, and worked as a Certified Medical Assistant.  Moore worked at BS&W's family medicine clinic in Copperas Cove, Texas for several months before she was transferred to the Urgent Care facility in Killeen.  Moore, who is African-American, testified that she suffers from severe anxiety and panic disorder.  Dkt. No. 22-21 at 13-14; 25-26.  Moore's suit primarily arises out of a conversation she had with co-workers on or around November 5, 2016. A group of workers were discussing the upcoming presidential election and Moore mentioned that she wasn't voting.  Dkt. No. 17-30 at 9-10.  One of the co-workers, who is white, then said, "I know why you're not voting," and Moore responded, "Okay. Well, why?" and the co-worker said "Oh, well, because you're a felon." *Id.* at 10.  Moore expressed that she thought that statement was inappropriate, and asked why she would say something like that, and the other employee said,  "Well, because all black people or most black people have felonies, so I know that's why you can't vote," to which Moore responded, "Well, actually, um, I just thought I couldn't vote because I was a North Carolina resident." *Id.*  Moore stated again that she thought the statement was inappropriate, and she intended to report it to their supervisor, which led to the the other employee to remark to a third employee that Moore was acting like "she had called [Moore] a nigger." *Id.*

Immediately following this conversation, Moore tried to report the event to her supervisor, Marlene Hill, but she was unable to find her.  Dkt. No. 17-30 at 8.  Ultimately, she reported the

conversation the next day. *Id.*; Dkt. No. 22-21 at 12. For her part, Hill categorically denies ever receiving a complaint from Moore, and BS&W's human resources records also do not reflect Hill ever passing on any such report. Dkt. No. 17-33 at 7. The co-worker also denies ever making any of the statements attributed to her. Dkt. No. 17-37 at 4. Within weeks of the complaint, Moore received three write-ups. Dkt. Nos. 22-13; 22-14, 22-17. The first two, though they addressed events from several weeks past, were dated December 4, 2016. After these two write-ups, Moore contacted an HR help line called "People Place" to complain about the work environment and how she was being treated. Dkt. No. 22-15. On December 22, Moore received yet another write up, involving charting a patient's temperature when she had not taken the temperature.

Moore felt this third infraction was further retaliation, and she therefore went to the HR department and made an in-person complaint, meeting with HR representative David Shaw. She explained not only that she felt she was being harassed and retaliated against, but she also informed him she was suffering from panic attacks and anxiety as a result. Dkt. No. 22-16 at ¶ 17. Shaw stated he would pass her information on to the HR person assigned to Moore's workplace, and Moore inquired about whether she should go back to work. *Id.* at ¶ 8. Shaw told her that "I'm not trying to make you go back. I would just say to at least call them, call your supervisor and let them know that you either came to HR and you are going home, or that you just left for the day, that way it's not like job abandonment, and then they would have to release you from employment." *Id.*[2] Moore informed Hill via text message that she was going home sick, and Hill responded that she needed to know if Moore would be working December 23-24, as she was scheduled. Dkt. No. 22-2.

_____

[2]Moore made an audio recording of her visit with HR on December 22, 2016, and the quoted language comes from a partial transcript of the recording included within Moore's declaration.

After an exchange of brief messages regarding whether Moore would be working those days, Hill wrote that "Layla, I just spoke with HR, this will not be resolved today as it will be investigated. However, you were not advised not to return and therefore you must return to your shift and role or it could be considered abandonment of job." *Id.* Moore responded to explain that she was unable to return, as "the stress at the job is causing [her] to be ill." *Id.* She further explained that she was not just leaving work, but that "me being so stressed crying and unable to work to me is no different than leaving sick which is basically what I did the only difference is that I went to HR." *Id.* Consistent with this, when she left the HR office, Moore went to the Freedom Medical Clinic, where she presented with symptoms of anxiety, and was told she should stay home from work until December 26. Dkt. No. 22-21 at 18; Dkt. No. 22-10.

Later that afternoon, another supervisor, Chris Payne from the Killeen Urgent Care Clinic, texted Moore and again told her that she needed to work the next two days and that "[n]ot returning to work would be filed as voluntary resignation." Dkt. No. 22-3. Moore responded that "I'm sorry I'm ill. . . . Me not coming is not just because I went to HR[,] which you all are making it seem. It is because clearly me crying having anxiety attacks and being overwhelmed with stress today to the point I was in my car hyperventilating is not good for work." *Id.* Payne seemed not to take these statements at face value, and, ignoring Moore's statements that she was calling in sick, responded that "[t]he information that was given to me from HR is that you will need to report for your shift based on the information they currently have from you regarding the situation. If there are additional details you need to share, please call People Place." *Id.* Notwithstanding Moore's clear statements that she was calling in sick, on December 26, 2016, BS&W fired Moore because she had two straight days of "no show/no call." Dkt. Nos. 22-11; 22-17. Inconsistent with what was actually said in their

5

communications—which are in writing having been sent via text message—Hill described the events in the termination paperwork as follows:

> On 12/22, employee abandoned job without notifying supervisor of absence nor return. Upon reaching employee, employee was instructed to return to next scheduled shifts; however, employee insubordinately refused to return to scheduled shifts and did not call nor show up for scheduled shifts on 12/23 nor 12/24.

Dkt. No. 22-17. As noted earlier, BS&W claims it was never aware of any complaints of racially charged remarks, nor was it aware that Moore suffered from any disability, much less an anxiety or panic disorder. It further contends that Moore was properly fired for not showing up to work on December 23 and 24, and not calling ahead to say she would not be there.

## IV. ANALYSIS

Moore appears to allege race discrimination and retaliations claims under Tile VII, the TCHRA and 42 U.S.C. § 1981, and a disability discrimination claim in violation of the ADA and TCHRA.[3] BS&W contends that there are no genuine issues as to any material fact on any of Moore's claims in this case and that summary judgment should be entered. Specifically, BS&W argue that Moore has failed to establish *prima facie* cases of disability or race discrimination and that even if she had, she has failed to demonstrate its proffered reason for her termination was a pretext. BS&W also alleges that Moore cannot establish a *prima facie* case of retaliation in response to a complaint of racial discrimination.

---

[3]"The analysis of discrimination and retaliation claims under § 1981 and the Texas Labor Code are identical to the analysis of Title VII claims, and the Court will therefore analyze the claims under Title VII. *See e.g. Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 386 (5th Cir. 2017) ("The analysis of discrimination claims under § 1981 is identical to the analysis of Title VII claims."), *cert. denied*, 138 S. Ct. 1009 (2018). For the same reason, the Court analyzes Moore's disability-related claims under ADA. *See Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 n. 2 (5th Cir. 2019)

## A.    Title VII Race Discrimination Claim

In her Complaint, Moore titles Count Three as "Discrimination and Retaliation in violation of Title VII," but actually only alleges a retaliation claim in the body of the Complaint. Dkt. No. 1 at 6.  In addition, Moore acknowledged in her deposition that she was not bringing a race discrimination claim. Dkt. No. 17-30 at 22.  Moore also has failed to respond to BS&W's argument that it is entitled to summary judgment on her race discrimination claim.  Given this, it appears that—to the extent Moore was ever making a race discrimination claim—she is now abandoning it. *See Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 at n. 1 (5th Cir. 2006) ("[Plaintiff's] failure to pursue this claim beyond her complaint constituted abandonment."). Summary judgment is therefore appropriate on this claim.

## B.    Title VII Retaliation Claim

Moore does, however, complain that BS&W retaliated against her after she complained to her supervisor and to HR about the racist comments her co-worker made to her.  The burden shifting framework the Supreme Court established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), applies to retaliation claims under Title VII when direct evidence of discriminatory or retaliatory intent is lacking. *Long v. Eastfield Coll.*, 88 F.3d 300, 304-05 (5th Cir. 1996).  Under this framework, the plaintiff must first establish a *prima facie* case of retaliation. *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007).  "If the plaintiff makes a *prima facie* showing, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action." *Id.* at 557.  If the employer articulates such a reason, "[t]he burden then shifts to the plaintiff to demonstrate that the proffered reason is a pretext for discrimination." *Id.*

### 1. *Prima Facie* Case

To establish a *prima facie* case of Title VII retaliation, Moore must show: (1) she engaged in a protected activity; (2) she experienced an adverse employment action following the protected activity; and (3) a causal link existed between the protected activity and the adverse employment action. *McCoy*, 492 F.3d at 556-57.

### a. Protected Activity

Under Title VII, "protected activity" means (1) opposing an unlawful employment practice, or (2) making a charge under, or testifying, assisting, or participating in, an investigation, proceeding, or hearing under Title VII. *Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 372 (5th Cir. 1998). The summary judgment record shows that Moore engaged in protected activity on three separate occasions. First, there is at least a fact question as to whether Moore complained to Hill about the racist comments her co-worker had made. Though Hill denies that any such report was made, Moore has testified to the contrary. Second, Moore testified that she reported the racial comments and subsequent retaliation to the People Place hotline. Lastly, she contends she reported the same discriminatory and retaliatory behavior to HR representative David Shaw. This last report was audio recorded. Even if the first two reports were not made, there is little doubt that the last visit to HR plainly qualifies as protected activity. *EEOC v. EmCare, Inc.*, 857 F.3d 678, 683 (5th Cir. 2017) ("making complaints to HR" is a protected activity);

Instead of arguing that the reports do not constitute protected activity, BS&W tries to skip the trial stage of this case, and simply attacks Moore's credibility with regard to whether she ever made these complaints. As counsel surely knows, however, it is black letter law that credibility determinations may not be made at the summary judgment stage. "Credibility determinations, the

weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255(1986). In addition, BS&W's arguments that Moore's testimony should not be considered because it is self-serving and conflicts with BS&W's evidence is flatly without merit. The Fifth Circuit has stated multiple times that self-serving affidavits may serve as competent summary-judgment evidence. *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 245 (5th Cir. 2016) (trial court "erred in rejecting [one party's summary-judgment] statements as self-serving"); *C.R. Pittman Const. Co. v. Nat'l Fire Ins. Co. of Hartford*, 453 F. App'x 439, 443 (5th Cir. 2011) (noting that "[a] party's own testimony is often 'self-serving,' but we do not exclude it as incompetent for that reason alone"). In sum, Moore has demonstrated that she engaged in protected activity.

### b. Adverse Employment Action

Next, Moore must show she suffered an adverse employment action. The Fifth Circuit has made clear that an adverse employment action is an "ultimate employment decision" like "hiring, firing, demoting, promoting, granting leave, and compensating." *Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014). "An employment action that does not affect job duties, compensation, or benefits is not an adverse employment action." *Stroy v. Gibson on behalf of Dep't of Veterans Affairs*, 896 F.3d 693, 699 (5th Cir. 2018) (internal citations omitted). BS&W argues that Moore's complaints about increased workload, a negative work environment and verbal and written reprimands do not constitute adverse employment actions. While the Court agrees that such allegations without more would not constitute adverse employment actions, BS&W ignores the fact

that the entire focus of Moore's lawsuit is that she was fired. "[I]t is beyond dispute that a termination constitutes an adverse action." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 283 (5th Cir. 2004).

c. Causal Connection

Moore alleges that she has established the causal connection prong by the fact that she was terminated approximately six weeks after she made her initial complaint of race discrimination to Hill. "Close timing between an employee's protected activity and an adverse employment action can be a sufficient basis for a court to find a causal connection required to make out a prima facie case of retaliation." *Mooney v. Lafayette Cty. Sch. Dist.*, 538 F. App'x 447, 454 (5th Cir. 2013). The Fifth Circuit has held that a two or three month period between events is sufficient to establish a causal connection between the protected activity and the adverse employment action. *Johnson v. Halstead*, 916 F.3d 410, 421 (5th Cir. 2019) (three months); *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 219 (5th Cir. 2016) (two months). The six week time period between Moore's initial complaint and her termination is enough demonstrate a *prima facie* causal connection here.

2. **Legitimate Nondiscriminatory Reason**

With the burden shifted to it, BS&W contends it had a legitimate nondiscriminatory or nonretaliatory reason for terminating Moore. It contends that it terminated Moore because she violated the "no call/no show" policy when she failed to show up for work on December 23 and 24, 2016, or to call in sick ahead of that time. It offers evidence that BS&W had a written absentee policy that allowed termination for two consecutive days of not showing for work and not calling. Dkt. No. 17-6 at 2. If true, this qualifies as a legitimate reason for BS&W's action. *Paris v. Sanderson Farms, Inc.*, 542 F. App'x 370, 374 (5th Cir. 2013).

10

### 3.     Pretext

The burden therefore shifts back to Moore to demonstrate that BS&W's stated reason for her firing is pretextual.  Pretext can be demonstrated by showing that the employer's stated reason is false.  As the Supreme Court explained almost 20 years ago, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148.  Because the parties' communications were in writing, and those text messages were preserved, there is a very strong record in this case—indeed, stronger than in most cases—that BS&W's stated reason for firing Moore was false.  At a minimum, there is a fact question on the point.  As noted in the factual summary above, Hill stated in her termination memo that she was firing Moore because Moore had "insubordinately refused to return to scheduled shifts and did not call nor show up for scheduled shifts on 12/23 nor 12/24." Dkt. No. 22-17.  But it could not be more clear from Moore's texts to both Hill and Payne on December 22, that she was informing both of them that she was suffering from severe anxiety, was "ill" and "sick" and that she was not going to be able to come to work before December 26.  Dkt. Nos. 22-2 and 22-3.  Further, the providers at the Freedom Medical Clinic advised her to stay home from work until December 26.  Dkt. No. 22-10.  Moore told both Hill and Payne that she was *not* claiming that the reason she had to miss work was to allow the HR department to investigate her complaint, but instead was calling in sick.  This is more than enough evidence to allow a jury to conclude that BS&W's stated reason for firing Moore was patently false, and thus a pretext for discrimination.

**C. ADA Claims**

**1. ADA Accommodation Claim**

Although Moore has failed to allege a separate failure to accommodate claim under the ADA in her Complaint or in her EEOC Complaint, she appears to be attempting to raise such a claim in her Response and Sur-Reply. *See* Dkt. Nos. 22 & 24. "A failure-to-accommodate claim under the ADA is distinct from a claim of disparate treatment." *Windhauser v. Bd. of Supervisors for Louisiana State Univ. & Agric. & Mech. Coll.*, 360 F. App'x 562, 565 (5th Cir. 2010). A failure to accommodate claim provides a mechanism to combat workplace discrimination even when the employee in question has not suffered adverse employment action. *See Bridges v. Dep't of Soc. Servs.*, 254 F.3d 71, 71 (5th Cir. 2001). In this case, Moore has suffered an adverse employment action and thus her claim is "most properly brought as a discrimination-terminate action" and not a failure to accommodate action. *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 703 n. 6 (5th Cir. 2014). Because Moore has not alleged the failure to accommodate claim in her Complaint and has not moved to amend her Complaint to add such a claim, the Court need not decide whether BS&W is entitled to summary judgment on that claim. *Xodus v. Wackenhut Corp.*, 626 F. Supp.2d 861, 864 (N.D. Ill. 2009) (denying summary judgment motion as moot with regard to failure to accommodate claim as the claim was not included in complaint). Having said this, whether BS&W could have reasonably accommodated Moore's disability may still be relevant to the qualification element of Moore's discrimination claim.

**2. ADA Discrimination Claim**

Though she has not pled an accommodation claim, Moore's Complaint does allege a disability discrimination claim. Title II of the ADA prohibits an employer from discriminating

12

against an employee who is a "qualified individual with a disability on the basis of that disability."

42 U.S.C. § 12112(a). To establish a *prima facie* ADA discrimination claim, a plaintiff must prove:

(1) she has a disability; (2) she was qualified for the job; and (3) she was subject to an adverse

employment decision on account of her disability. *E.E.O.C. v. LHC Group, Inc.*, 773 F.3d 688, 697

(5th Cir. 2014). The same burden shifting analysis applicable to the Title VII claim is also applicable

here. *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 615 (5th Cir. 2009).

### 1. Does Moore have a disability?

Under the ADA, a plaintiff has a disability if she has "a physical or mental impairment that

substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). "[M]ajor life

activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing,

eating, sleeping, [and] walking." *Id.* § 12102(2)(A). The EEOC has cautioned that the phrase

"substantially limits" is "not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i). "An

impairment need not prevent, or significantly or severely restrict" performance of major life

activities, but rather, the standard is whether it "substantially limits the ability of an individual to

perform a major life activity as compared to most people in the general population." *Id.* at

§ 1630.2(j)(1)(ii). This comparison "usually will not require scientific, medical, or statistical

analysis." *Id.* at § 1630.2(j)(1)(v). The EEOC instructs that courts should construe "disability"

broadly "to the maximum extent permitted by the terms of [the Act]." 42 U.S.C. § 12102(4)(A).

Moore has presented sufficient evidence to create a fact issue on whether she has "a physical

or mental impairment that substantially limits one or more major life activities." *Id.* § 12102(1)(A).

Specifically, Moore's deposition testimony shows that she was diagnosed with generalized anxiety

in 2002 and has suffered anxiety and panic attacks on and off since that time. Dkt. No. 22-21 at 25-

26. Moore has sought hospital treatment and has been medicated for her anxiety and panic disorder throughout this time. *Id.* When she suffers from a panic attack she has heart palpitations, confusion, sweating, lack of ability to focus and concentrate, and sometimes passes out. *Id.* at 23. Though BS&W challenges Moore's credibility on this point, this is not appropriate at the summary judgment stage. A jury must determine the credibility of Moore's claim. Moore's evidence is thus enough to create a fact issue as to whether her panic and anxiety disorder qualifies as a disability under the ADA. *See Mercer v. Arbor E & T, LLC*, 2013 WL 164107, at *13 (S.D. Tex. Jan. 15, 2013) (plaintiff's testimony she suffered from decreased concentration sufficient to demonstrate a fact issue regarding existence of a disability).

### 2. Is Moore qualified?

"The term 'qualified individual' means an individual who, *with or without reasonable accommodation*, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (emphasis added). BS&W contends that Moore was not qualified for her job as a certified medical assistant because "an essential function of Plaintiff's position . . . is being present at work to assist in the delivery of patient care" and "Plaintiff's failure to call or report to work for two consecutive days violated the attendance policy and shows she does not possess the qualifications for the position. Dkt. No. 17 at p. 11. This analysis is flawed.

Fundamentally, "regular attendance is an essential function of most jobs," and an employee's failure to return to work after medical leave might demonstrate their being physically unqualified to perform the essential functions of their position. *Hypes v. First Commerce Corp.*, 134 F.3d 721, 727 (5th Cir. 1998); *Moss v. Harris Cnty. Constable Precinct One*, 851 F.3d 413, 418 (5th Cir. 2017) But here, Moore only sought two-and-a-half days off to deal with her anxiety disorder. While

"indefinite leave" might not be a reasonable accommodation,"*Amsel v. Texas Water Dev. Bd.*, 464 F. App'x 395, 400 (5th Cir. 2012), a two day leave period would, *Moss*, 851 F.3d at 418.  As one district court stated "a person who seeks reasonable leave remains qualified for a position so long as following the leave they can complete the essential functions of the job." *Reed v. Jefferson Par. Sch. Bd.*, 2014 WL 1978990, at *3 (E.D. La. Apr. 24, 2014).  Moore had clearly been qualified to perform her job for the many months before her complaint triggered the actions at issue here, and her request for two days off is not enough to undermine that conclusion.  There is at least a fact issue regarding whether Moore was qualified for her position.

### 3.      Did BS&W terminate Moore because of her disability?

Next, Moore must show that she was terminated on account of her disability.  BS&W argues that Moore cannot make such a showing because Hill was unaware of Moore's alleged disability.  Moore has presented evidence disputing this allegation and contends that she first informed Hill in September 2016 that she was being treated for an anxiety disorder.  Dkt. No. 17-30 at 16-17.  Moore also alleges that she informed BS&W again when she called and texted Hill and Payne on December 22, 2016, and informed them she was having an anxiety problems.  This is sufficient to raise a fact issue with regard to whether BS&W was aware of Moore's disability. [4]  Accordingly, BS&W is not entitled to summary judgment with regard to Moore's ADA discrimination claim.

## IV.  RECOMMENDATION

Genuine issues of material fact exist on Moore's Title VII retaliation claim and her ADA discrimination claim.  However, Moore has abandoned her Title VII race discrimination claim.

---

[4]BS&W also argues that it did not fire Moore because of her disability  because it fired her for violating the no call/no show policy.  The Court has already concluded that there are fact questions precluding summary judgment on that basis.

Therefore, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment (Dkt. No. 17) be **GRANTED IN PART** and **DENIED IN PART**, and that the district judge **GRANT** the Motion for Summary Judgment with regard to Plaintiff's race discrimination claim under Title VII, the TCHRA and 42 U.S.C. § 1981, but **DENY** the Motion with regard to all other claims.

## V. WARNINGS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(c); *Thomas v. Arn*, 474 U.S. 140, 150-53, 106 S. Ct. 466, 472-74 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED this 19th day of June, 2019.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE